**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DAWN R ZIEHMER,

         CASE NO. 17-10024
   *Plaintiff*,     DISTRICT JUDGE GEORGE CARAM STEEH
*v.*         MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

  *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 12, 14)

## I.  RECOMMENDATION

  In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Ziehmer is not disabled. Accordingly, **IT IS RECOMMENDED** that Ziehmer's Motion for Summary Judgment, (Doc. 12), be **GRANTED**, that the Commissioner's Motion, (Doc. 14), be **DENIED**, and that this case be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for further consideration.

## II.  REPORT

### A.  Introduction and Procedural History

  Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Dawn Ziehmer's ("Ziehmer") claim for Supplemental Security Income

benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 14).

On July 3, 2013, Ziehmer filed an application for SSI, alleging a disability onset date of January 12, 2013. (Tr. 253-60). The Commissioner denied her claim. (Tr. 127-42). Ziehmer then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on February 4, 2015 before ALJ Manh H. Nguyen. (Tr. 66-99). A supplemental hearing was later held on July 29, 2015. (Tr. 100-25). The ALJ's written decision, issued November 18, 2015, found Ziehmer not disabled. (Tr. 44-65). On November 9, 2016, the Appeals Council denied review, (Tr. 1-7), and Ziehmer filed for judicial review of that final decision on January 4, 2017. (Doc. 1).

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See*

*Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court

will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994). If the Commissioner's decision is supported by substantial evidence, "it must be

affirmed even if the reviewing court would decide the matter differently and even if

substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations

omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than
> [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment
> or combination of impairments that "significantly limits . . .
> physical or mental ability to do basic work activities," benefits
> are denied without further analysis.
>
> Step Three:   If the claimant is not performing substantial
> gainful activity, has a severe impairment that is expected to

last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two. 20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically

determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Ziehmer not disabled under the Act. (Tr. 44-65). At Step One, the ALJ found that Ziehmer had not engaged in substantial gainful activity since April 29, 2013, her application date. (Tr. 49). At Step Two, the ALJ concluded that the following impairments qualified as severe: coronary artery disease, degenerative disc disease of the lumbar spine, diabetes mellitus, lymphadenopathy, allertic rhinitis, asthma, chronic mastoiditis, diastasis, obesity, deep vein thrombosis, post-traumatic stress disorder ("PTSD"), dysthymic disorder, and borderline personality disorder. (Tr. 49-50). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 50-52). Thereafter, the ALJ found that Ziehmer had the residual functional capacity ("RFC") to perform sedentary work, except:

> [S]he can lift and carry up to 10 pounds, can stand or walk up to 2 hours in an 8-hour workday, and sit for up to 6 hours in an 8-hour workday. The claimant can occasionally operate foot controls or push and pull with her lower extremities. She cannot climb ladders, ropes, or scaffolds, and cannot kneel, or crawl. She can occasionally climb stairs and ramps, and can occasionally stoop, balance, and crouch. For every 30 minutes of sitting, standing, or walking, she must be able to change positions for 3 minutes before resuming the prior position. She can frequently reach, handle, and finger with either hand. She can occasionally turn her neck side to side or up and down during the workday. She cannot do commercial driving or work around unguarded/uncovered moving machinery. She can tolerate

occasional exposure to environmental pollutants, such as fumes, dust, and smoke. She can remember, understand, and carry out simple instructions. She can make simple judgments. She cannot perform work that is production rate pace, such as assembly line work. She can tolerate occasional changes in the workplace. She cannot interact with the general public. She can occasionally interact with supervisors and co-workers. She would need to use a service dog throughout the workday.

(Tr. 52). At Step Four, the ALJ found Ziehmer incapable of performing her past relevant work. (Tr. 57). But proceeding to Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ziehmer can perform. (Tr. 57-58).

### E.     Administrative Record

#### 1.     Medical Evidence

The Court has reviewed Ziehmer's medical records. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.     Application Reports and Administrative Hearing

##### i.     Function Report

On July 20, 2013, Ziehmer filled out a Function Report that appears in the administrative record. (Tr. 311-323). Describing her conditions, she noted swelling in her neck "causing hear loss," "PICC lines due to infect[ions]," pain, fever, an inability to get out of bet, "frequent" neuropathy in her feet and legs causing instability and difficulty walking, a need to check her blood sugar regularly, and trouble driving due to vision loss. (Tr. 316). In a typical day, she would take her medication after waking up, check her blood and urine for irregularity, eat lunch, and go to her living room if feeling well

6

enough to do so. (Tr. 317). "I can't sleep well" due to her "severe" neuropathy at night and "off[-]the[-]charts" pain. (*Id.*). She required help dressing, bathing, and sometimes using the toilet; she could not shave or care for her hair. (*Id.*). She sometimes needed reminders to check her blood sugar. (Tr. 318). She prepared one meal per week with assistance from her older children, and otherwise ate "easy[,] no cook foods" like sandwiches. (*Id.*). She could do light housework—such as laundry or making her bed and cleaning herself up—with "lots of help." (*Id.*).

She left her house once daily "if I can," and remained able to drive for up to ten miles, "but no more due to at any moment my sight can go away due to swelling." (Tr. 319). She shopped for groceries and "personal needs" one or two times a month. (*Id.*). She retained the capacity to pay bills, count change, handle a savings account, and use a checkbook/money orders. (*Id.*). Her hobbies included watching television, swimming, and singing "if neck is not swollen too much." (Tr. 320). Although she could not do these activities "well," she took solace in the fact that "at least I get joy at times." (*Id.*). She spent time talking with others on a daily basis, and attended church every week. (*Id.*). Nevertheless, her condition affected her ability to engage in social activities. (*Id.*).

In reference to her past, Ziehmer noted difficulty at times with her family because they "took sides on me being in foster care" and being "sexually abused" because "they tell me it[']s my fault because I never told for a few years." (Tr. 321). And the fact that her depression often tethered her to her home exacerbated her anxiety. (*Id.*).

Prompted to mark abilities with which she encountered difficulty, Ziehmer marked: lifting, squatting, bending, standing, walking, sitting, hearing, stair climbing,

seeing, memory, completing tasks, and getting along with others. (*Id.*). She was ambidextrous due to the "PICC line" in her right arm. (*Id.*). She could walk five to ten minutes on a good day without needing five minutes' rest. (*Id.*). She could pay attention only for up to thirty minutes, but had little trouble following spoken or written instructions. (*Id.*). Because "I get intimidated fairly easily," she did not get along with authority figures well. (Tr. 322). Nor could she deftly handle stress or changes in routine. (*Id.*). She listed a fear of men as an unusual behavior or fear she suffers from. (*Id.*). Each day she relied on crutches, glasses, orthotics, and braces or a splint. (*Id.*).

In closing, Ziehmer indicated that "I have great difficulties when my infection levels spike," which "causes a whole system to be paralyzed. I can't sit [or] stand but can't really get out of bed sometimes for weeks at a time. . . . It has been years struggling with MRSA and bone infection in my jaw." (Tr. 323).

### ii.       Ziehmer's Testimony at the Administrative Hearings

Ziehmer's first hearing occurred on February 4, 2016. (Tr. 66-99). She noted that she lives at home with her eight children, and that "the older kids" offer "[l]ots of help" in taking care of her younger children. (Tr. 72). "I'm there for moral support. If I'm having a good day, I can cook. . . . I make doctors' appointments and make sure they get to their doctors' appointments whether it be by me driving or her, my spouse driving [or] someone else driving. I can monitor bath time. They're old enough to take their own baths. So, and help them, with homework." (Tr. 73). She could prepare meals two to three times a day. (*Id.*). When her children participate in extracurricular activities such as marching band or football, she tried to attend when able. (*Id.*).

In 2013, Ziehmer dropped out of college because she had been sick enough to take medical leave for three semesters in a row, and "I just decided that until I feel better if that happens, then I cannot attend to continue to make the medical leave of absence." (Tr. 76). In the past, she held two jobs at once: babysitting and working at a daycare. (*Id.*). "I changed infant diapers, fed them, cradle[d] them, walked them around if they were upset." (*Id.*). At one point, she worked as a home attendant, which involved "dishes, light housework, taking a person to the store, making meals. That's pretty much about what it was." (Tr. 77). In addition to these jobs, she had previously worked as a "companion and case aide," at Corey Place, a "runaway shelter for teenagers." (*Id.*). "Companion was to be at a desk watching security cameras. And if a teenager needed help in the middle of the night, I would be able to talk to them. Like if they had a nightmare or something like that, that's what that would have been is taking care of a child." (*Id.*). As for her work as a case aide, "if they needed me during the day on off hours, I would go in and speak with a child or go in and play like the Wii or spend one-on-one time with a child because these children didn't have parents. So you're pretty much [their] figure of parent." (Tr. 78).

She ultimately left the position at the shelter "because I got sick. Best job I've ever had. Wish that I could still work there, but I cannot. I was missing too much work. I ended up in the hospital with a PICC line. And they told me that because my work was inconsistent and I couldn't show up when I was supposed to show up, and they couldn't count on, then I was not dependable. So I could not work there any longer." (Tr. 79). "[T]owards the end, I was missing almost every single time that I was scheduled which I worked every single weekend. I worked Friday, Saturday, and Sunday and worked 12-

hour shifts. Prior to that probably 3-4 times a month easy, sometimes twice a week. I would show up for Friday and Saturday, and be sick Sunday night." (Tr. 79-80). The sickness occurred as a result of the removal of her wisdom teeth—"I got osteomyelitis in the bone and then MRSA." (Tr. 80). She was discharged because Dr. Stewart, her treating physician, "basically . . . felt he couldn't do anything more" for her, and "told me that the next step" was "to go to the Mayo Clinic" in Minnesota. (Tr. 81). Her physician at the time of the hearing, Dr. Lynch, "decided to remove the PICC line." (Tr. 82). Elaborating on her infection's status, Ziehmer relayed: "It's inflamed. It's swollen. Sunday was a very, very bad day. I could hardly see. I ended up staying the entire day. I went to church, made it home in time enough to go, to get very, very violently ill and stayed in bed the entire day. Monday was very bad as well and I ended up staying in bed. Yesterday I could get up and on things and I could finally eat something. And then today it's swelling and I'm in pain. But I can tolerate it." (*Id.*).

Ziehmer then testified about her neuropathy. (Tr. 84-85). She noted that while at home, "I have to wear shoes all the time because if I do not wear shoes and I step on something, I will not know because I don't have feeling. And if I do something and I step on something, and, and I feel it, we know that it's really bad." (Tr. 85). "I feel like there are 1,000 pins in my feet like electrocuting my feet. It actually sometimes happens in my arms and my legs." (*Id.*). Her face also swelled regularly, complicating her vision problems. (Tr. 86). When this occurred, "I cannot drive. You cannot count on me to get places or doctor's appointments unless I have a driver. Seeing the television, I can't really see the television unless I either sit up closer or it limits me to be able to see like if I'm

cutting something. . . . So it limits pretty much every day." (Tr. 87). Aside from this problem, Ziehmer noted episodes of vertigo "[t]hree or four times a week," causing her to fall. (Tr. 88). When this occurs, she does not recover for "[u]sually a full day, especially on days like today. If I take an anti-inflammatory which I'm not supposed to because of the Coumadin, it will take less time. But I also take the chance of my blood count being too high and bleeding out somewhere so."

The ALJ proceeded to question Ziehmer on her mental health following abuse of her and her children at the hands of her first and second husbands. She indicated that her depression kept her from leaving bed some days. (Tr. 91). "I want to say that there are moments every day that I feel overwhelmed. But they go in swings. I'm okay one minute. The next minute I'm not okay. If I'm triggered by a certain scent or something of TV could trigger like the police even."(Tr. 91). And because her mother killed someone while "driving in a vehicle," Ziehmer did "not like going out. . . . I wish I could teleport myself places because then I wouldn't have to go through the struggle of being in a vehicle." (Tr. 92).

Ziehmer's second hearing occurred on July 29, 2015, and focused on changes in her condition after the hearing in February. (Tr. 100-125). She discussed events in chronological order, noting that she "was hospitalized for pneumonia because I had a cold" which lasted for "three weeks" preceding her hospitalization, and then suffered a stomach problem in March. (Tr. 107). Her face had also swelled up a number of times, for which she began taking antibiotics. (*Id.*). "They told me I had a blocked salivary gland at that time, and that I had a bad tooth. I have since . . . gotten the tooth taken out

and still having problems." (*Id.*). She next suffered a spate of tachycardia and health care providers told her that she "more than likely would have to have another heart cath because when it was checked a couple of years ago, it was 40 percent blocked." (Tr.108).

Asked about how these events affected her ability to walk or climb stairs, Ziehmer noted that "I am not sure that I would be able to walk very far or stand very long because when I do stand for long periods of time, the neuropathy kicks in and I'm in excruciating pain at like 8. Even on, even on Neurontin, it[] still hurts." (Tr. 109). In all, she estimated an ability to stand "[p]robably 20 minutes, half hour latest, without having to sit down." (*Id.*). To control her diabetes, "I have an internal insulin pump that is in my stomach at all times. I carry it on my chest. And I also have a service dog in training that she alerts me and has alerted me twice and like scratched on me. And told me that I was having a high blood sugar attack and a low blood sugar attack. And she gave me 20 minutes to react. So I also have to monitor every two hours and put it in my insulin pump what my blood sugar is as well." (Tr. 110). Later, she acknowledged that the service dog was not "prescribed by a physician. It was just talks, able to talk about it. And then when I was able to get one, that's when it was set in stone. . . . We just talked about it." (Tr. 116).

Ziehmer also discussed issues using her hands. "There are some days I drop things and can't feel the fingertips. I was told that it was from neuropathy. But I was also told that it could be some residual from having blood sugars checked all the time in my fingers." (Tr. 111). Her pain plagued her every day in some form, which interfered with her capacity to leave her house. (Tr. 112). "I had an entire week where I could not get out of bed." (Tr. 113). her counsel then began to inquire into Ziehmer's PICC line. (Tr. 114).

The line was installed due to "a staph infection from my insulin port," which recurred one other time, "but I was never hospitalized." (*Id.*). It was removed because she had "a blood clot in my heart." (*Id.*).

On the topic of her psychiatric condition, Ziehmer noted a fear of men due to past abuse. "I am extremely intimidated by men. The last job that I had that was working at the Corey Place . . . I had a female supervisor and it was intimidating enough. I don't even think that I could even at this point working under a man would scare me." (Tr. 116).

### iii.        The VE's Testimony at the Administrative Hearings

At the first hearing, the ALJ's first hypothetical was as follows: "This person can occasionally lift/carry up to 20 pounds, frequently lift/carry up to 10 pounds. Stand/walk up to six hours in an eight-hour workday. Sit for up to six hours in an eight-hour workday. The person can occasionally operate foot controls and/or push/pull with the lower extremities. The person cannot climb ladders, ropes, or scaffolds, kneel or crawl. The person can occasionally climb stairs and ramps, balance, stoop, and crouch. The person cannot work in an occupation that requires him or her to use a computer screen or view surveillance videos. Th[e] person cannot perform commercial driving. The person cannot work around unprotected heights or unguarded, uncovered moving machinery. The person can carry out simple instructions. The person can tolerate occasional changes in the workplace. The person can occasionally interact with the general public, supervisors, and coworkers. Let me change the last one. I'll change the last one a little bit. The person cannot interact with the general public but can occasionally interact with

supervisors and coworkers. . . . [W]ould a person with these restrictions be able to perform any of the claimant's past relevant work?" (Tr. 95). The VE replied that "the home health nurse would be feasible as actually performed, but not as identified in the general public *Dictionary of Occupational Titles*." (*Id.*). Other jobs existed, however, including: "electrical accessories assembly—with 42,000 national job availabilities—"small parts assembler"—with 27,800 national job availabilities—and "inspector hand packager"—with 48,600 national job availabilities. (Tr. 96).

For the second hypothetical, the VE was asked to assume "everything in the first hypothetical except for the following. This person would be 20 percent off-task during the workday due to inattention, lack of focus or distractions. This person would also miss three days of [the] week a month." (Tr. 96). The VE indicated that "either one of these restrictions would eliminate competitive employment on their own." (Tr. 97).

The ALJ then asked whether, "[r]elative to the jobs that were described in response to the first hypothetical . . . an individual, due to a physical condition would be required to lay flat or prone for more than an hour at a time one day a week even during the time that the person would be regularly scheduled to work, would that restriction allow the person to be involved in those employments on an unscheduled basis?" (*Id.*). In the VE's estimation, employers "might" tolerate such a limitation for a "certain length of time," but "wouldn't tolerate it permanently." (*Id.*).

At the second hearing, the ALJ asked a different set of hypothetical questions. The first hypothetical posed a person able to "lift/carry up to 10 pounds at a time. This person can stand/walk up to two hours in an eight-hour workday. This person can sit for up to six

hours in an eight-hour workday. The person can occasionally operate foot controls or push/pull with the lower extremities. The person cannot climb ladders, ropes, or scaffolds, kneel or crawl. The person can occasionally climb stairs and ramps, stoop, balance, and crouch. For every 30 minutes of sitting, standing or walking, the person must be able to change positions for approximately three minutes before resuming the prior position. This person can [occasionally] reach, handle, and finger with either hand." (Tr. 119-20). The VE indicated that such a person could not perform any of Ziehmer's past work, but that the job of surveillance system monitor—with 17,000 national availabilities—would remain available. (Tr. 120-21).

The ALJ's second hypothetical presented "additional change[s]" that the person could frequently reach and handle, and "will need the use of a service dog through the workday, would a person with that limitation be able to perform any other work that exists in significant numbers in the national economy given a similar age, education, and work experience as the claimant?" (Tr. 121). The VE replied that "[s]urveillance system monitor would stand. I would think that assembler positions, but these would be done at a bench or table, not on an assembly line"—with 21,000 national availabilities— and "[p]ackaging at a bench or table"—with 23,000 national availabilities. (Tr. 122).

The ALJ's third hypothetical added an additional limitation that "[t]he person cannot interact with a male supervisor." (*Id.*). The VE indicated that such a limitation would preclude competitive employment. (Tr. 123).

Nearing the end of the hearing, the ALJ offered some final observations: "To be honest with you, all three hypotheticals or with any of the three, I would find your client

were disabled to be honest with you because I'll find the occasional reaching at sedentary unskilled would need our definition of our policy under 96.9(p). . . . Hypo 2 and Hypo 3 has the frequent back into the system. But regardless, because the service dog is an accommodation, I'll find that hypothetical to be disabling. And of course, [the VE] indicated that the change in Hypothetical Three is disabling by itself without need of an accommodation." (Tr. 123-24).

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both    "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the

16

Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an

impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Ziehmer furnishes two arguments in her memorandum: (1) the ALJ indicated that requiring assistance from a service dog was a disabling limitation, yet included this limitation in Ziehmer's RFC and found her not disabled, depriving the decision of support from substantial evidence, (Doc. 12 at ID 1221-23); and (2) "the ALJ ignored the

severe impairment of MRSA and the limitation attached to the condition," (Doc. 12 at ID 1224). I address each in turn.

### 1.    Service Dog Limitation

According to Zeihmer, "[t]he only testimony upon which the case could rest was based on a hypothetical that did not include a significant limitation the ALJ himself found to exist." (Doc. 12 at ID 1224). The RFC in the ALJ's written decision mirrors the second hypothetical granted the VE in Ziehmer's second hearing. *Compare* (Tr. 52), *with* (Tr. 123) ("[B]ecause the service dog is an accommodation, I'll find [the second hypothetical] to be disabling."). In Ziehmer's estimate, the ALJ's remarks at the hearing show that he did not rely on the second hypothetical question, and "[a]s the first hypothetical to [the VE] omitted the reference to the service dog it was defective and in essence irrelevant." (Doc. 12 at ID 1222). It follows, Ziehmer suggests, that the ALJ's Step Five conclusions lack support from substantial evidence.

Where a claimant proves she cannot return to past work, the ALJ holds the burden of proving that other work she can perform exists in the national economy. *E.g. Matelski v. Comm'r of Soc. Sec.*, 149 F.3d 1183, at *9 (6th Cir. 1998) (unpublished table decision) (citing *Barney v. Sec'y of Health & Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984)). Fulfilling this burden requires that—should the ALJ rely on the VE's testimony—she ensure it contains no unresolved conflicts. *See* SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000) (requiring the adjudicator to "elicit a reasonable explanation" for any "apparent unresolved conflict between VE . . . evidence and the DOT . . . before relying on [that] evidence to support a determination or decision about whether the

claimant is disabled, and further, to "resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information"). Moreover, VE testimony may only constitute substantial evidence if given in response to a hypothetical question that "'accurately portrays [a claimants] individual physical and mental impairments.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)).

Ziehmer's argument rests primarily on the following statement by the ALJ seeming to confirm that the hypotheticals including a service-dog accommodation would be disabling:

> Hypo 2 and Hypo 3 has the frequent [reaching and handling] back into the system. But regardless, because the service dog is an accommodation, I'll find that hypothetical to be disabling. And of course, [the VE] indicated that the change in Hypothetical Three is disabling by itself without need of an accommodation.

(Tr. 123-24). Indeed, the VE indicated that the use of a service dog "would be accommodated or need to be accommodated by an employer" under the ADA. (Tr. 122).

As numerous cases confirm, and as the Commissioner correctly recognizes, "the ALJ's final decision is contained not in any oral remarks made at the administrative hearing, but in the . . . written decision. . . . Even assuming the ALJ made a different finding at the administrative hearing, that earlier decision is not binding on the ALJ." *Briggs v. Colvin*, No. 1:12-CV-02117-MC, 2013 WL 4521116, at *2 (D. Or. Aug. 26, 2013), *aff'd,* 634 F. App'x 621 (9th Cir. 2016). In other words, an ALJ may ordinarily change his mind as to a claim's outcome following a hearing. The present scenario,

however, is not ordinary. In *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), the Supreme Court observed that the SSA "does *not* take the possibility of 'reasonable accommodation' into account" when determining whether an individual is entitled to SSI or DIB. *Id.* at 803 (emphasis added). The rationale for this rule derives from the volatility of such considerations—"the matter of 'reasonable accommodation' may turn on highly disputed workplace-specific matters; and an SSA misjudgment about that detailed, and often fact-specific matter would deprive a seriously disabled person of the critical financial support the statute seeks to provide." *Id.*

In practice, courts in the Sixth Circuit have found VE testimony infirm if predicated on assumptions about ADA accommodations. The court in *Widener v. Astrue*, No. CIV.A. 08-107-DLB, 2009 WL 2778215, at *3-4 (E.D. Ky. Aug. 27, 2009), for instance, remanded a case in which the ALJ assumed—based, in part, on the VE's testimony—that an employer would accommodate absences due to ureteral stent replacement. *Cf. Harris v. Colvin*, No. 3:12CV2302, 2013 WL 4517866, at *4 (N.D. Ohio Aug. 21, 2013) (affirming the ALJ's reliance on VE testimony because "[a] fair reading of the hearing transcript does not show that the VE implicitly or explicitly assumed that future employers would be willing to modify the identified jobs to suit claimant's needs"); *Titus v. Astrue*, No. 1:11CV1286, 2012 WL 3113165, at *13 (N.D. Ohio June 12, 2012), *report and recommendation adopted,* No. 1:11CV01286, 2012 WL 3113160 (N.D. Ohio July 31, 2012) (rejecting a similar challenge where "[t]he VE never suggested that the hypothetical individual might require a 'reasonable accommodation' [under the ADA] in order to perform the work," "assumed an employer would be willing

to make such accommodations," or indicated "that the hypothetical individual's employability was contingent on whether an employer was willing to make an accommodation"). And the hearing in this case typifies the concerns expounded in *Cleveland*, for the Commissioner readily concedes that the VE "went on to testify that she would consider the use of a service dog an 'accommodation' under the 'ADA,' [and] also stated that it would be accommodated by employers." (Doc. 14 at ID 1241) (quoting (Tr. 122)).

At the hearing, the ALJ confessed a "particular[] interest[] in getting evidence showing that the service dog is required from a medical opinion." (Tr. 124). Even in the written decision, the ALJ's language betrays a certain reluctance to endorse the evidence for such a limitation. (Tr. 54) ("Despite the lack of evidence to indicate that the use of this animal was a medical necessity, I considered the effects of this as accommodation when assessing the claimant's residual functional capacity."). To be sure, he explicitly attempted to distance his determination from any implication as to disability under the ADA. (*Id.*) ("To the extent that the claimant's use of a service dog is an implied opinion that the claimant is 'disabled' under the Americans with Disabilities Act, I gave that opinion little weight as such findings are not binding on the Commissioner."). But the ALJ cannot have it both ways: including the limitation in the RFC assessment appears to have involved reliance on the VE testimony at issue at Step Five. Reliance on such testimony was reversible error, for it rendered his Step Five finding unsubstantiated. A remand for further proceedings is therefore warranted.

### 2. MRSA Infection

Ziehmer also contends that "the ALJ failed to acknowledge [her] history of MRSA infections." (Doc. 12 at ID 1224). This argument fares poorly, partly because the ALJ absolutely did mention her "continuous MRSA bone infections." (Tr. 53). Additionally, and as the Commissioner astutely notes, "the medical records she cites in support of her argument relate to her treatment for mastoiditis, which the ALJ found was a severe impairment." (Doc. 14 at ID 1242-43) (citing (Tr. 49)). The ALJ went on to discuss Ziehmer's infections, including the records from treatment with Dr. Stuart on which her argument relies. (Tr. 53). The record amply bolsters the ALJ's findings. *E.g.* (Tr. 437, 439, 442, 445, 489, 592, 685, 695, 708-09, 721, 741, 971) (records showing MRSA or mastoiditis as improving, under control, or nonexistent). For these reasons, Ziehmer's argument as to her MRSA infections remains unconvincing, and the Court should reject it.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Ziehmer's Motion for Summary Judgment, (Doc. 12), be **GRANTED**, that the Commissioner's Motion, (Doc. 14), be **DENIED**, and that this case be **REMANDED** under Sentence Four of 42 U.S.C. 405(g).

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A

party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 28, 2017                S/ PATRICIA T. MORRIS
                                         Patricia T. Morris
                                         United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 28, 2017                    By s/Kristen Castaneda
                                                              Case Manager